# UNITED STATES OF AMERICA
## WESTERN DISTRICT OF NEW YORK

_____

DARRYL GILLIAM,

Plaintiff,

-vs-

DECISION AND ORDER

LT. HAMULA, Chemung County Jail, MARK JONES,
ANNE DANIELS, JOHN BRINTHAUPT, Acting Sheriff
on the date of the incident, SUPERINTENDENT OF
CHEMUNG COUNTY JAIL, SHERIFF OF CHEMUNG
COUNTY, and ELNORA VANRENSSELAER,

06-CV-6351-CJS-MWP

Defendants.

_____

## APPEARANCES

For Plaintiff:                    Francis X. Young, Esq.
                                  81 Main Street Suite 118
                                  White Plains, NY 10601
                                  (914) 285-1500

For Defendants Lt. Hamula, Anne   Donald S. Thomson, Esq.
Daniels, John Brinthaupt, Superinten-  Davidson & O'Mara, P.C.
dent of Chemung County Jail, Sheriff   243 Lake Street
of Chemung County and Elnora Van  Elmira, NY 14901
Rensselaer:                       (607) 733-4635

## INTRODUCTION

**Siragusa, J.** The case is before the Court on Defendants' motion seeking an

order pursuant to Federal Rule of Civil Procedure 56 dismissing the action in its entirety.

Notice of Motion, ECF No. 59 (May 6, 2011). For the reasons stated below, the

application is granted in part and denied in part.

## FACTUAL BACKGROUND

Pursuant to Western District of New York Local Rule of Civil Procedure 56, the moving party filed a Statement of Material Facts, ECF No. 59-1 (May 6, 2011). The local rule places a duty on the opposing party to file and opposing statement. The text of that rule reads in its entirely as follows:

> Opposing Statement. The papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried. Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.

W.D.N.Y. Loc. R. Civ. P. 56(a)(2). Plaintiff, in his opposing papers, filed what he entitled a "Statement of Material Facts," ECF No. 61-13 (Jul. 11, 2011). Plaintiff's statement repeats information provided in Defendants' statement, then, using subparagraphs, recites facts from Plaintiff's point of view, or lists areas in which Plaintiff disputes Defendants' statement. The Court will deem Defendants' statement admitted for purposes of the motion, except as indicated, below, in brackets where Plaintiff disputes the information:

> 1. The Plaintiff, Darryl Gilliam, was in the Chemung County Jail as a pre-trial detainee following his release from a NYS Correctional Facility for the period of September 7, 2005 to March 16, 2006, for an assault alleged to have been committed while in state custody. [Plaintiff provides information as to other inmates housed in the same area.]

> 2. The Plaintiff alleges in his Complaint that on December 13, 2005, that he was attacked by several inmates for "violations of rights recognized and arising under the first, fourth, fifth and Fourteenth Amendments of the United States Constitution". *See* page 5, paragraph a. of Plaintiff's

Complaint, Document 7. [Plaintiff adds additional details, including a quote allegedly from Mark Jones.]

3. Through the course of investigation and previous Decisions and Orders of this Court, the remaining Defendants are Lt. John Hamula, Elnora VanRensselaer (former John Doe #4), Mark Jones (former John Doe #1), John Brinthaupt, Acting Sheriff (former John Doe #5) and Christopher Moss as the current Sheriff in his official capacity only. *See* Decision and Order of April 18, 2007.

4. The Plaintiff has never properly commenced the action against Officer Mark Jones. [Plaintiff contends he properly commenced the action against Mark Jones by giving a summons and complaint to the U.S. Marshal on April 24, 2007, and contends that Mark Jones was served on June 21, 2007.]

5. Plaintiff alleges that Mark Jones threatened him by telling him that he "would be taught a lesson" and that he should not be filing any more complaints against Department of Correctional Services staff (New York State, not affiliated with the Chemung County Jail). First factual statement on page 7 of 13 in Document 7, the Complaint. [Plaintiff includes quotes allegedly from Mark Jones.]

6. Plaintiff alleges, but there is no written evidence of, his having filed a grievance against Officer Mark Jones. *Id*.

7. Plaintiff alleges that Lt. John Hamula told him that he did not have time to look into the complaint, that the complaint was nonsense, and that if he filed another complaint some action would be taken against him. *Id*. Plaintiff then alleges on December 13, 2005, that he was assaulted by five inmates in his cell block area while Mark Jones is alleged to have observed the assault and his having not intervened until well into the assault by the several inmates. *Id*. at bottom paragraph. [Plaintiff adds information concerning Mark Jones.]

8. Plaintiff alleges that in the assault he was beaten "in and out of consciousness." *Id*. [Plaintiff adds that the treating physician in the emergency room of the hospital stated, "It sounds like more or less [Plaintiff] had some blackouts. He did bump his head."]

9. Plaintiff alleges that three of the inmates continued to stomp on his head with their feet and kick him, and was also caused to suffer multiple stab wounds and was repeatedly hit and pummeled with "blunt objects." *Id*.

10. Ultimately, he alleges that Officer Jones convinced the inmates to stop assaulting him and lock in their cells. *Id*.

11. Plaintiff then alleges that he was made to sit in his cell "for hours" before being seen by Elnora VanRensselaer, the jail nurse on duty. See page 8 of 13 of Document 7, carry over paragraph. [Plaintiff adds information from the log book and the medical record, which the Court discusses below.]

12. He indicates that the nurse visually observed him and stated that he looked fine and then left with Lt. Hamula and each stating that the Plaintiff "finally got what my hand was calling for." *Id*.

13. Plaintiff alleges that Lt. Hamula then moved him to a holding cell in booking where "I remained for hours." Plaintiff alleges that in spite of his pleas for medical attention he was kept there six and a half hours until he "began to choke/regirgitate (sic) on my own blood before an ambulance was called and I was then taken to the Arnot Medical Hospital." *Id*. [Plaintiff concedes that it was less than 6½ before he received treatment at the hospital.]

14. A Sheriff's Deputy (Ruocco) interviewed Mr. Gilliam on December 14, 2005 at the Chemung County Jail to take the report of assault. [Plaintiff points out that Deputy Ruocco's report was not written until February 14, 2006.]

15. Plaintiff alleges that there was a lack of follow up on that initial report until early 2006. *Id*. The Plaintiff alleges that a District Attorney from Chemung County questioned him regarding the assault. [Plaintiff describes the steps he took to bring attention to his assault, including writing several letters.]

16. Plaintiff's Complaint regarding the presence of a "shank" taken from a mop wringer handle, sharpened and used on him (allegedly) is not directed at any individual. *See* pages 9-10, carry-over paragraph of Document 7. [Despite not including the names in his *pro se* amended complaint, Plaintiff points out that he has repeatedly "made clear that inmates Michael Scharborough, Dominic Perone, Jason Lopez, Lamont Page, and James Johnson assaulted Plaintiff." He further details acts allegedly committed by Mark Jones, which he contends facilitated the assault, and details evidence found during cell searches, including "[b]lood soaked clothing" in "Inmate Perone's cell…." ]

17. The Plaintiff's Complaint was filed on January 9, 2007. *See* Document 7.

18. The Plaintiff was incarcerated at the Westchester County Jail on January 9, 2007 for a parole violation in connection with his conviction for felonious assault. Gilliam deposition at 10 and 19. [Plaintiff disputes the relevance of this fact.]

19. The Plaintiff acknowledged that he was having a problem getting along at the Chemung County Jail because of the way "he carried himself" and the "way he addressed situations." Gilliam EBT, 27. ["Plaintiff describes himself as 'a pen pusher.'"]

20. Prior to December 13, 2005, when interviewed at the Chemung County Jail by the Inspector General, he made no complaint regarding his treatment at the Chemung County Jail. *Id.* at 28, 36. [Plaintiff disputes this assertion and states that he did complain to the Inspector General about his treatment at Chemung County Jail, but claims the inspector was not interested.]

21. Prior to December 13, 2005, he had no problems or potential problems with other inmates. *Id.* at 29.

22. When asked specifically the manner in which Officer Mark Jones threatened him, the first incident was where Mark Jones verbally instructed him to back off, stop creating problems for himself and relax and finish up his time because he is upsetting a lot of people. *Id.* at 30. A second incident occurred prior to December 13, 2005 in which Mark Jones instructed him that he needed to "cut it out" that he just wasn't getting it, to behave and to stop writing things up. *Id.* at 39. [Plaintiff describes words Mark Jones allegedly said to him about his lawsuit against Elmira Correctional Facility personnel.]

23. Prior to December 13, 2005, he did not consider Mark Jones or any other CO at the Chemung County Jail to be a threat to him. *Id.* at 40. ["However, Plaintiff 'was having problems with almost every Officer [he] encountered.' (Gilliam EBT at 29:3–4)."]

24. On December 13, 2005, the Plaintiff took upon himself to clean the shower area and while doing so was cursing at the other cell block inmates. *Id.* at 43.

25. Later that day, he testified that he was asleep in his cell when his door opened without any reason. *Id*. at 47. [Plaintiff describes how he locked himself into his cell and could hear it open, and that only the officers can unlock cell doors.]

26. Despite him testifying that there were five inmates at his cell door when he awoke, he walked to the cell door and called to Officer Jones asking why he opened his cell when he was assaulted by being punched by another inmate. *Id*. at 47-49.

27. The Plaintiff believes that he told the investigating deputy the following morning that he did not wish to press charges against either the inmates or Officer Jones. *Id*. at 76-77. [Plaintiff explains he was in fear.]

28. At the hospital emergency room (St. Joseph's Hospital) on the evening of the incident, the Plaintiff told the doctor "I am not going to rat them out." *Id*. at 77. [Plaintiff told hospital personnel he wanted to get help.]

29. Deputy Michael Ruocco, who responded to the jail to do the prelimi-nary investigation on December 14, 2005 at 8:24 a.m. noted that Gilliam stated that he had been making comments that bothered people, calling the other inmates names as he cleaned the shower area, that while he was watching TV that someone struck him with a sock with bars of soap in it and that then the others on the block started to kick him. He documented that Mr. Gilliam told him that the Correction Officer Jones ordered the inmates to stop and secure into their cells. Mr. Gilliam also stated that he did not want any trouble, did not want to be seen by a doctor, but was later ordered to go to St. Joseph's Hospital by Corrections Lt. Sullivan. Officer Ruocco further reported that he informed the plaintiff that he would need to give a detailed written statement to have the subjects arrested and the Plaintiff responded that he was not a snitch and did not want any charges filed, further stating "I just want them to sweat it out and think that I am pressing charges." Deputy Ruocco then closed the case on that basis. Deputy Ruocco then closed the case on that basis. *See* Police Investiga-tion Report at page 3, Narrative Section.

30. Plaintiff admitted that he the initial investigating officer's report was accurate. Gilliam EBT at 78. [Plaintiff feared retaliation.]

31. The Sheriff's Department file included a letter dated December 16, 2005 indicating that the Plaintiff did wish to pursue charges. On January 4, 2006, Investigator Sullivan interviewed the Plaintiff, continued the investigation, documents of which are included in the police investigative report exhibit and a decision was made by the District Attorney's Office not to pursue charges. Police Inv Rpt. [Plaintiff details the procedural history

of the investigation and decision not to proceed with criminal charges and points out that the discovery does not indicate what was given to the District Attorney's office.]

32. In the letter of December 16, 2005, marked as Exhibit A, the Plaintiff provided a different version of the beginning indicating that he walked over and started speaking of the dangers of germs, bacteria and viruses when inmate Mike Scarborough punched him from the side with what appeared to be a metal rod, Dominic Perrone hit him with what appeared to be a sock with soap in it, was choked and held down for some period being kicked and punched with no mention of Officer Jones being present until after he woke up from unconsciousness and heard CO Jones tell them "he's had enough, leave him alone now" and that as Plaintiff started to get up off the floor the inmates rushed him again at which time Officer Jones said "I mean it now. Get up off him or I'll mace you!" and they retreated at that point. *See* Exhibit A at pages 1-2. [Plaintiff relates what Mark Jones allegedly stated, contending that it shows Mark Jones was reckless.]

33. In a letter to the District Attorney on December 27, 2005, the Plaintiff offered a different version still of the assault indicating that he had multiple puncture wounds, two to his left eye, one to his elbow and one to his left arm with cuts all over his body, *etc*., but acknowledging that when the Deputy did the initial investigation following the assault he had told him that he was unsure if he wanted to press charges and risk being labeled a snitch. *See* Exhibit C. [Plaintiff added details about being labeled a snitch, but stated he did not want his assault forgotten.]

34. In the letter to the District Attorney, he again makes no mention of Officer Jones having been present or facilitating the assault, but lays the entire offense at the feet of three of the inmates with regards to ongoing controversies with them. *See* Exhibit C.

35. The Plaintiff then apparently wrote a letter to the Commission of Correction on January 9, 2006, marked as Exhibit F mentioning for the first time the notion that Officer Jones had any culpability in the attack. *See* Exhibit F at second paragraph. [Plaintiff disputes that this letter was the first time he mentioned that Mark Jones had any culpability in the attack. He relates that conversation between Mark Jones and Lt. Hamula on December 14, 2005. He also relates that he told Lt. Sullivan about the assault and Mark Jones' alleged culpability in a conversation on the morning of December 14, 2005.]

36. Plaintiff's Exhibit 5 indicates that Officer Jones remarked in the log book at 2:50 p.m. on December 13, 2005 that inmate Gilliam was not getting along with the rest of the inmates and question marks regarding that entry were added. *See* Plaintiff's Exhibit 5.

37. This entry is consistent with the report of Officer Edward Butts who relieved Officer Jones at Post Five at 3:35 p.m. *See* Officer Butts Statement as part of the Police Investigation Report. The 3:40 p.m. entry by Officer Butts indicates Lt. Sullivan was notified of the problems with D. Gilliam and at 4:00 p.m. Lt. Sullivan and Sargent Skrozknik were on the floor to investigate the problems there and noted that it appeared that Darryl Gilliam had been involved in a physical altercation. Plaintiff's Exhibit 5. [Plaintiff adds additional details about Officer Butts' incident report and the log book.]

38. At 4:25 p.m., Nurse Lenora [sic] VanRensselaer was on the floor at which time Officer Butts indicates that Darryl Gilliam was seen and refused medical treatment with ice to be given to him. [Plaintiff disputes this and cites information from his deposition transcript to refute her contentions, which the Court discusses in detail, below, at 23.]

39. Lt. Sullivan reported in his statement of December 13th that after he learned of the assault on the Plaintiff, the facility nurse was summoned at approximately 4:15 p.m., the Plaintiff was uncooperative with her, he was moved to the booking area where he awaited a new cell assignment, Lt. Sullivan reported to the Superintendent of the jail that there was an unsubstantiated rumor of a weapon being used to assault the Plaintiff, the CERT team was activated to perform a shake down and following that Lt. Sullivan noticed that Mr. Gilliam's condition had deteriorated considerably and instructed the desk officer to obtain an ambulance for the Plaintiff whereupon he was transported to the hospital without incident. *See* Police Investigative Report, last two pages. [Plaintiff describes in detail the physical effects of his injuries while he was in a cell in booking.]

40. The Erway Ambulance Service, Inc., crew was on sight at 5:49 p.m. and conducted an assessment of the Plaintiff which found a blunt injury fracture to the facial area, swollen left eye, and blood in the mouth. No abnormalities were found for the chest, all other areas of the body were assessed with no abnormalities (genitalia not assessed), and a report of pain in the Plaintiff's  upper back. No contusions were noted anywhere except the left eye area.  *See* Patient Care Report of SJH Med Records. The Narrative Report indicated only that he was assaulted and struck with what was believed to be a sock with a bar of soap in it. *See* Patient Care Report at page 3 of 3. [Plaintiff provides details as to his assessment by

a member of the ambulance team, and the detailed time log of when he was treated and how.]

41. He was seen at the St. Joseph's Hospital Emergency Room at 6:20 p.m. and seen by Adrian M. Gonzales, RPA-C, who noted that the Plaintiff told him "I am not going to rat them out." He had complaints of neck pain, posterior head pain and extreme jaw pain with dry blood in his mouth. The Plaintiff denied any chest, back, upper back or lower back discomfort or any injury to anywhere other than a contusion over his left eye making it difficult for him to open it. *See* Emergency Room Report under history of present illness and physical examination. No other complaints were noted, in particular no notation of any cuts, lacerations, wounds consistent with being struck by a metal rod or any indication of multiple kicks or punches. *See* SJH Med Records. [Plaintiff details his injuries, which the Court discusses in more detail, below, at 24.]

42. Elnora VanRensselaer, R.N., indicates in her entry that on December 13, 2005 at 4:26 p.m., Lt. Sullivan requested that she see the inmate who was apparently assaulted. She noted that she could visually tell that he was in a fight of some kind (left eye swollen). When she asked the inmate if he would let her assess him he stated a refusal: "He stated that he knows how the system works and would sign any paper refusing medical care." She directed Lt. Hamula to send ice to Post 5 for the plaintiff. *See* CCJ Health Care Notes.

43. The next Jail Health Note was at 5:45 p.m. when Nurse Spencer notes that Mr. Gilliam had severe pain and bleeding from an altercation and he was sent to the emergency room by ambulance for further evaluation. *Id*. [Plaintiff disputes that he refused medical treatment.]

44. John Brinthaupt retired from the Chemung County Sheriff's Office in December of 2005 and was Acting Sheriff on the date of the incident. Brinthaupt EBT at 4.

45. He was not present in the jail at any time during the incident.

46. While the Sheriff would be responsible for the jail and road patrol, the jail superintendent at that time was Lt. Daniel Mandell. Brinthaupt EBT at 7.

47. He had no recollection of the incident or other involvement. *Id*. at 8.

48. Lt. Daniel Mandell was the Superintendent of the jail from 2001 until the end of 2005, inclusive of the date of the assault. Mandell EBT at 4.

49. Lt. Mandell had no contact with the case or any part of the incident except to the extent that Capt. Wilson, his subordinate, indicated that he would be handling the internal part of the investigation. *Id*. at page 8.

50. John Hamula was a lieutenant in the jail at the time of the incident, having retired in July of 2007. Hamula EBT at 4.

51. He was in charge of the 7:30 – 3:30 shift at the jail. *Id*. at 5.

52. Lt. Hamula essentially did not remember any of the reports or its investigation. He does recall the procedures if a fight is to break out in a cell block between two or three different inmates, to the effect that the officer is to call for assistance, never enter the cell block alone and attempt to get the inmates back into their cells so as to stop the fight while attempting to summon assistance. Hamula EBT at 60-61.

53. Otherwise, at his Examination Before Trial, Lt. Hamula was simply asked various procedures around the jail and none with regard to any threats or problems with the Plaintiff.

54. There has been no indication in discovery provided that there is any policy or procedure of Chemung County, the Sheriff or the Chemung County Jail to condone, allow or permit any activity or conduct such as is alleged by the Plaintiff to have occurred on or about December 13, 2005. [Plaintiff related the testimony of Lt. Mandell concerning counseling and disciplinary measures taken in a supervisor learned about a correction officer's violation of practice and procedure. Plaintiff also recites facts from the incident report of Captain Charles Wilson that Mark Jones left keys in the d-block 716 control door, which Lt. Mandell characterized as a serious breach of procedure. Plaintiff also recites entries in Mark Jones' training jacket.]

55. Defendants had information from Lamont Page about this incident. [Plaintiff adds additional information about Lamont Page from Officer Strong, including Page's observation that Inmate Perone was chocking Plaintiff and kicked him in the face when Plaintiff was passed out on the floor. Plaintiff also points out that no records show that Dominic Perone, Mike Scharborough, Jason Lopez, James Johnson, or Mark Jones were ever interviewed.]

Def.s' Statement of Material Facts, ECF No. 59-1 (May 6, 2011), with notations by the

Court from Pl.'s Statement of Material Facts, ECF No. 61-13 (Jul. 11, 2011).

In his responding papers, Plaintiff withdrew the claims against defendants John Brinthaupt, Christopher Moss, and Daniel Mandell. Young Decl., ECF No. 61 (Jul. 11, 2011) ¶ 3. Defendant Mark Jones has not appeared in this action and is not represented by counsel.

On April 7, 2009, the Court held a pretrial conference and was informed by Plaintiff, who was still proceeding *pro se*, that Francix X. Young, of Young & Bartlett, LLP, might represent him. Subsequently, on June 12, 2009, Mr. Young appeared for Plaintiff in the pretrial conference held on that date, and the Court granted his request to reopen discovery. Minute Entry, ECF No. 48 (Jun. 12, 2009).

## STANDARDS OF LAW

### Summary Judgment

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof

in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

### Section 1983

Section 1983, derived virtually unchanged from the "Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes," (L. 1871, Ch. 22, Apr. 20, 1871), reads in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (1979).

### Respondeat Superior in § 1983 Cases

In *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit held that because *respondeat superior* does not apply in § 1983 actions, evidence of a defendant's personal involvement in the violation of a plaintiff's constitutional rights was a prerequisite to an award of monetary damages. *Colon* also set out five ways in which a supervisor could be held liable under § 1983:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873. The more recent Supreme Court case of *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), addressed an argument raising the issue of supervisory liability, stating that:

> respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

*Ashcroft*, 129 S. Ct. at 1949.

### Deliberate Indifference Claims Under 42 U.S.C. § 1983

To show that prison medical treatment was so inadequate as to amount to "cruel or unusual punishment" prohibited by the Eighth Amendment, Plaintiff must prove that Defendants' actions or omissions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat

a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" (*quoting Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). As the Supreme Court explained in *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991), this standard includes both an objective and a subjective component. With respect to the objective component, the court must ask whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights. With respect to the subjective component, the court must consider whether the deprivation was brought about by Defendants in wanton disregard of those rights. *Id*. To establish deliberate indifference, therefore, Plaintiff must prove that Defendants had a culpable state of mind and intended wantonly to inflict pain. *See Wilson*, 501 U.S. at 299; *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991); *Steading v. Thompson*, 941 F.2d 498, 500 (7th Cir. 1991; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992), *aff'd*, 970 F.2d 896 (2d Cir. 1992).

The Court in *Estelle* cautioned that mere negligence is not actionable. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106, 97 S. Ct. 285. Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind," *id.* at 102, or "incompatible with the evolving standards of decency that mark the progress of a maturing society," *id.* at 105-06. It is clear, then, that allegations of malpractice do not state a constitutional claim. *Id.*, 429 U.S. at 106 and n. 14, 97 S. Ct. 285; *Chance*, 143 F.3d at 703-04; *Ross*, 784 F. Supp. at 44.

Likewise, an inmate's "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703; *see also Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("The courts will not intervene upon allegations of mere negligence, mistake or difference of opinion"); *Massey v. Hutto*, 545 F.2d 45, 46 (8th Cir. 1976) (affirming dismissal of inmate's Eighth Amendment claim where evidence showed that "[t]o the extent that [the plaintiff] is not receiving the treatment he desires, his complaint reflects a mere disagreement over proper medical care"); *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864 (2d Cir. 1970) (affirming dismissal of an inmate's complaint alleging Eighth Amendment violations, because entire basis of his claim was his disagreement with the prison doctor's professional judgment).

## ANALYSIS

Because Plaintiff has withdrawn the claims against defendants John Brinthaupt, Christopher Moss and Daniel Mandell, the Court dismisses those parties from this lawsuit with prejudice. The remaining claims concern defendants Lieutenant John Hamula, Mark Jones and Nurse Elnora Van Rensselaer, all of the Chemung County Jail.

### *Defendant Mark Jones*

Although Defendants have moved to have the amended complaint dismissed in its entirety, since defendant Mark Jones ("Jones") has not appeared and is not represented, the Court considers that no application is pending with respect to Jones. During oral argument, Plaintiff contended that Jones had been served and, therefore, the Court has personal jurisdiction over him. Plaintiff has not followed the procedure in

Federal Rule of Civil Procedure 55 to obtain a default against Jones. Plaintiff contends in his memorandum in opposition to Defendants' motion for summary judgment that the Court should apply the "prison mailbox rule" with respect to Jones. *See Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 1999) (a *pro se* prisoner's papers are considered filed when they are handed over to prison officials for forwarding to the court). His argument is that since Plaintiff gave his complaint to prison officials prior to April 24, 2007, well within the three year limitations period applicable to his causes of action under § 1983, his complaint was timely filed. The Court agrees that the filing of the complaint with the Court was within the limitations period.

Plaintiff further contends that Jones was timely served because the U.S. Marshal's records show that service was effected within the limitations period. For this argument, Plaintiff relies on the Process Receipt and Return, Form USM-285, ECF No. 61-1 (filed Jul. 11, 2011) ("USM-285"). That document lists defendant Lt. Hamula of Chemung County Jail as the person to be served, but in the block titled, "Serve At" is the following: "Mark Jones, 49 Alvord Drive, Elmira, NY 14905." Below that is a portion for the Marshal to fill in, and there it states in relevant part, "I hereby certify and return that I have legal evidence of service, the process described on the individual … at the address shown above…." The date of service is June 21, 2008, and below that is a signature of the U.S. Marshal or Deputy (the signature itself is illegible). Below that are these two notes: "Mailed 4/24/07 Received 6/21/08." *Id.* In the Court's paper file on this case is a letter from Donald S. Thompson, Esq., dated January 29, 2008, addressed to the Honorable Marian W. Payson, U.S. Magistrate Judge, in which Mr. Thomson stated:

> As a follow-up to the Rule 16 conference, I had indicated that Mark Jones had not yet been served. He was identified in accordance with Judge Larinmer's [sic] Order of April 18, 2007, as John Doe # 1. On July 17, 2007, I had contacted Mary Liebky at the US Marshal's office and received a return telephone call from Jack Code at which they [sic] verified that Mark Jones had not yet been served. I provided each of them with Mark Jones' last known address at 49 Alvord Drive, Big Flats, NY 14814. Mr. Jones is no longer an employee of Chemung County.

Letter from Donald S. Thomson, Esq., to Judge Payson (Jan. 29, 2008) (located in the Court's paper file for this case).

In his Reply Declaration in Support of Motion for Summary Judgment, ECF No. 63 (Aug. 3, 2011), Donald S. Thompson, Esq., states that the USM-285 referred to above "was erroneously completed by John Gould, an unpaid intern working in the Marshall's [sic] office at that time," and "attached to the [USM-285] which Plaintiff argues is for Mark Jones is the acknowledgment of service for 'Lt. Hamula at the Chemung County Jail'." *Id*. ¶¶ 1 and 3. He concludes, "it is fair to assume that the unpaid intern in the Marshal's office took the USM-285 with the defendant's name listed as 'Lt. Hamula of Chemung County Jail' and attached it to the Statement of Service by Mail instead of to the USM-285 that was actually intended for Lt. Hamula." *Id*. ¶ 6. He also points out that the Clerk's docket entry for February 11, 2008, states, "Summons Issued as to Elnora VanRensselaer, Mark Jones. (TO) (Entered: 02/11/2008)," which leads to the conclusion that as of that date, Mark Jones has not yet been served. Mr. Thompson does not represent Mark Jones and concludes, "to the best of your declarant's knowledge, Officer Mark Jones has not in fact acknowledged service by mail and has not requested that the County defend and indemnify him for the suit, implying that in fact he has not been served personally either." *Id*. ¶ 8.

The Court notes that the docket for this case shows the entry of an Order on January 31, 2008, directing the U.S. Marshal to serve copies of the complaint on Mark Jones. Order, ECF No. 39 (Jan. 31, 2008). Following that is the entry referred to above, showing that the Clerk issued the summons for Mark Jones on February 11, 2008. The docket does not indicate that Mark Jones ever acknowledged service.

Pursuant to Federal Rule of Civil Procedure 4(d)(1), a defendant who receives notice of an action and request for waiver has an affirmative duty to avoid unnecessary costs involved with service of process by executing and returning the waiver and the failure to do so will subject that defendant to an award of costs and attorney's fees for service. 1 MOORE'S FEDERAL PRACTICE, § 4.13 (Matthew Bender 3d Ed.). The goal of service of a summons is to provide the defendant notice that an action has commenced and instruct the defendant to appear before the court to defend against the complaint. *Id*. § 4.03. As Moore's further explains:

> Service of process made defective due to technical errors may be rendered valid by the court if defendant receives adequate actual notice of the commencement of the action. Indeed, a court will not dismiss an action against a defendant who received notice of the action unless defendant is prejudiced by a defective summons. For example, if defendant is improperly served, but nevertheless answers the complaint, appears in the action, and is not otherwise prejudiced by the defective service, a motion to dismiss probably would be denied. Similarly, a minor defect on the face of the summons--such as the failure to inform defendant of the prescribed time to answer the complaint--does not necessarily deprive the court of personal jurisdiction over defendant.
>
> Defendant's actual notice that an action has commenced and the defendant's familiarity with the nature of the charges alleged in the complaint is admissible evidence to demonstrate lack of material prejudice.

1 MOORE'S FEDERAL PRACTICE, § 4.03 (Matthew Bender 3d Ed.). In an Order entered by

the Honorable Michael A. Telesca on March 9, 2007, ECF No. 9, the Court directed the

following:

> Pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d. Cir. 1997) (per curiam),
> the Court requests that the County Attorney of Chemung County ascertain
> the full names of the John Doe defendants plaintiff seeks to sue. The
> County Attorney is also requested to provide the addresses where all of
> the defendants can currently be served. The Attorney General need not
> undertake to defend or indemnify these individuals at this juncture. This
> order merely provides a means by which plaintiff may name and properly
> serve the defendants as instructed by the Second Circuit in Valentin.

Mr. Thompson, in a letter to Judge Telesca, ECF No. 11 (Apr. 10, 2007), at 1, stated in

response to the Order that, "[b]ased on the description of the individual's duties provided

by the plaintiff in his papers, the identity of John Doe # 1 is Mark Jones, who is no longer

in the employ of Chemung County, and resides at 49 Alvord Drive, Elmira, NY 14905."

Since Jones has not acknowledged service, and the Marshal's USM-285 does not show

personal service on Jones, the Court must proceed on the assumption that he has not

been served. This is especially troubling here, since it was the Court's and the Marshal's

duty to serve Jones as a result of the Order entered by U.S. Magistrate Judge Marian W.

Payson on January 31, 2008, ECF No. 39. That Order directed the Marshal to serve

Mark Jones at 49 Alvord Drive, Big Flats, N.Y. 14814. The evidence before the Court

shows this was not accomplished.

Accordingly, the Court does not, at present, appear to have *in personam*

jurisdiction over Jones. When, as here, a defendant does not appear, a plaintiff generally

proceeds by means of a motion for default, following the procedure in Federal Rule of

Civil Procedure 55. When a court is considering entering a default judgment, it may

dismiss an action *sua sponte* for lack of personal jurisdiction. *See Sinoying Logistics Pte*

*Ltd. V. Yi Da Xin Training Corp.*, 619 F.3d 207, 213 (2d Cir. 2010) (citing cases). No such application is currently pending. Thus, despite the briefing and oral arguments regarding Jones, the Court is not called upon to rule yet as to whether it has personal jurisdiction over Jones.

### Defendant Lt. John Hamula

Defendant Lt. John Hamula ("Hamula") contends that all of Plaintiff's allegations "involve either *respondeat superior* liability or of having been too slow to follow up with investigation of his complaints following the incident of December 13, 2005." Def.s' Mem. of Law, ECF No. 59-2 (May 6, 2011), at 1. Quoting from *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009), Plaintiff concedes that, "'[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" He argues that as Jones' shift supervisor on December 13, 2005, Hamula was familiar with prior threats Jones made against Plaintiff, at least twice. Pl.'s Mem. of Law, ECF No. 61-14, at 6. Those threats consisted of Jones telling Plaintiff that he would be taught a lesson and that he should not be filing further complaints against staff. Am. Compl., ECF No. 7, at 6. Plaintiff further states that he filed a grievance against Jones, which Hamula was assigned to investigate, but Hamula "informed Plaintiff that he [']didn't have time to look into [Plaintiff's] complaint[,'] disregarding it as nonsense," and told Plaintiff that if he "'filed another complaint against an officer [Lt. Hamula would] personally see to it that [Plaintiff] was going to be sorry for it.'" *Id*. quoting Am. Compl., at 6.[1] Plaintiff's argument is that,

---

[1]The amended complaint is sworn to by Plaintiff on December 28, 2005.

> While words alone do not rise to a constitutional violation, this grievance
> put Lt. Hamula on notice. Instead of brushing Plaintiff off, Lt. Hamula
> should have investigated, or at minimum kept a careful eye on Plaintiff. Lt.
> Hamula did neither because he too wanted to see Plaintiff "be taught a
> lesson."

*Id.*, at 6.

The evidentiary proof submitted does not show that Hamula's conduct amounted to a violation of Plaintiff's constitutional rights. Following *Iqbal*, Hamula's failure to investigate Plaintiff's grievance against Jones does not amount to a constitutional violation by Hamula. As the Southern District of New York observed in *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL 1835939 (S.D.N.Y. Jun. 26, 2009):

> Only the first and part of the third *Colon* categories pass *Iqbal*'s muster—a
> supervisor is only held liable if that supervisor participates directly in the
> alleged constitutional violation or if that supervisor creates a policy or
> custom under which unconstitutional practices occurred. The other *Colon*
> categories impose the exact types of supervisory liability that *Iqbal* elimi-
> nated—situations where the supervisor knew of and acquiesced to a
> constitutional violation committed by a subordinate.

*Bellamy*, 2009 WL 1835939, *6. The *Bellamy* case was affirmed by the Second Circuit in an unpublished decision. *Bellamy v. Mount Vernon Hosp.*, No. 09-3312-pr, 387 Fed. Appx. 55, 2010 WL 2838534 (2d Cir. Jul. 21, 2010). Nothing here shows that Hamula participated in a constitutional violation, or created a policy or custom under which a constitutional violation occurred to Plaintiff. Moreover, as Plaintiff candidly concedes, Jones' words alone do not rise to the level of a constitutional violation. *Holton v. Moore*, No. 96-CV-0077 (RSP/GJD), 1997 U.S. Dist. LEXIS 16178, *7 (N.D.N.Y. Oct. 15, 1997) ("verbal abuse without more is insufficient to state a claim"); *Dicker v. Jones*, No. 84 Civ. 3608 (LLS), 1986 U.S. Dist. LEXIS 24634, *11 (S.D.N.Y. Jun. 4, 1986).

**Nurse Elnora VanRensselaer**

In his amended complaint, Plaintiff described the beating he'd received, then

alleged the following about Nurse Elnora Van Rensselaer ("VanRensselaer"):

> I also suffered multiple stab wounds and was repeatedly hit and pummeled with blunt objects. After sitting in my cell for hours I was finally seen by John Doe #4 (A nurse with glasses and curly shoulder length blondish brown hair, caucasion in her early thirties, about 5ft llin 1451bs. who worked in C.C.J. medical Dept.) The nurse looked at me and said I look like I'm fine, and then left with Lt. Hamula both stating that I'd finally got what my hand was calling for.

Am. Compl., ECF No. 7, at 6–7. The Post 5 log book entries show the following:

> 12/13/5 Post # 5 → B-Line Cont Pop 22 c/ M. Jones….

> 1500   Lock down, rounds made Pop Count confirmed at 22 c/: M. Jones.

> 1533 Rounds made c/: M. Jones.

> 1540   End of shift Pop 22 Keys-12 1-Clipper ok Razors 22 c/: M. Jones.

> C-line 1540 START OF SHIFT c/o Butts on duty Post # 5. Pop 22. Head-count taken all c/o Jones—All inmates present & secured. Recv'd 12 keys, 22 razors & PR clippers. Active supervision cont's. Butts.

> 1540   Advised by c/o Jones of problems in D-Block. Inmates not getting along with Gilliam, D. Lt. Sullivan notified by c/o Jones. Butts.

> 1556   Jail count conf. Butts.

> 1600   Lt. Sulliven & Sgt. Skrozknik on floor to investigate problems in D-BLK. Inmate Perone, D. & Gilliam, D., appear to have been involved in a physical altercation. Per Lt. Sullivan D-block is to remain locked down under further notice. Butts.

> 1600   Rounds not made, due to above. Butts.

> 1620   Lt. Sullivan & Sgt. Skrozknik off floor. Rounds made. UNLOCK A, B, C Blocks. Butts.

> 1625   Nurse Elnora on floor to see Gilliam, D. He refused medical treatment. Ice to be given to him. Butts.…

1645   Gilliam, Barryl moved. New Pop 21. Butts.

Post # 5 Log, ECF No. 61-3 (Dec. 13, 2005), at 1–2. In a health care record entry,

VanRensselaer made the following note concerning Plaintiff's injuries:

> 12-13-05   Lt Sullivan requested I see this inmate [Plaintiff] @ 1626
> p.m. [sic]. Apparently inmate was assaulted. Upon arrival to
> Post 5 Cell Block D Inmate Gilliam sitting on bed, I visually
> could tell that he was in a fight of some kind (left eye
> swollen). I asked inmate if he would let me assess him.
> Inmage stated refusal. "He stated that he knows how the
> system works and would sign any paper refusing medical
> care." [sic] I asked if he would at least put ice on his eye, he
> agreed. Spoke [with] Lt Hamula and told him to send ice to
> Post 5. Will refer to RPA if necessary. Elnora Van
> Rensselaer RN.

Chemung County Jail Inmate Health Care Notes, ECF No. 59-6 (Dec. 13, 2005), at 1.

Plaintiff's deposition testimony concerning VanRensselaer contrasts with the note,

above. He testified that "when it first happened, the nurse and Officer looked right at me

and, you know, gave me my little, Okay, now do you get it? Now do you understand?

And walked away." Gilliam Dep., ECF No. 59-10 (Nov. 15, 2010, filed May 6, 2011), at

53:7–11. He testified that his injuries were severe:

> My vitals went, and everything. They called the ambulance. It was, He's
> fine now. Then the situation was deteriorating quite rapidly. My injuries
> were quite extensive. They didn't treat them. They didn't even consider
> them to be what they were at that point. They were life-threatening. If I
> didn't go by ambulance, I would have died.

Id., at 53:16–22. He stated that after the assault, VanRensselaer came to his cell, "[a]nd

she looked right at me and although, you know, I had extensive injuries, she said I'll be

fine. You'll live. And walked right away from me." Id., at 63:19–22. Most importantly,

Plaintiff was asked this question and gave this response:

Q. So if her notes indicated that you refused medical treatment, that would not be correct?

A. No, that's not correct. If you refuse medical treatment in a correctional facility there is a protocol and procedure that takes place. What happens, an inmate is given what is called a Refusal for Medical Treatment Form. He must sign that. If he signs that, the paper will be signed with two eyewitnesses, staff or civilians, stating the inmate refused to sign. It's put in a log book and is recorded. I never refused treatment. I was never offered treatment. I was looked at and examined to be mocked, not to get treatment. If I was looked at for the patient assessment, then they would have looked at the extensive damages that I had to my body. Said, Get this guy to a hospital.

*Id.*, at 63:23–64:15. Plaintiff also testified that when he was later moved from his cell, he

asked to see a nurse or a doctor, but his request was denied. *Id.*, at 65:4–11.

Plaintiff's injuries were extensive. As set out by him in his statement:

a. Plaintiff had complaints of neck pain, posterior head pain, as well as extreme jaw pain having a great deal of difficulty talking. He has some dry blood in his mouth. Plaintiff also "has a contusion over his left eye making it difficult for him to open the eye." Physical examination revealed Plaintiff has "exquisite pain at the jaw, difficult opening his mouth, likely a jaw fracture. He has periorbital and orbital ecchymosis and contusion." Plaintiff was "able to open the eyes somewhat." There is "some conjuncrival hemorrhage on the left." Ultimately, a CT of the facial bones noted a mid mental protuberance fracture of the mandible. (Document 59-5, Pages 3-4, Emergency Room Report. dated December 13, 2005).

b. The report states that Plaintiff denied any other pains or complaints. Plaintiff was in pain, and was injured in other places. However, Plaintiff does not deny that the focus of his pain was in his jaw, face, head. neck area.

Pl.'s Statement of Material Facts, ECF No. 61-13, ¶ 41(a) and (b).

As the Second Circuit stated in *Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994):

The deliberate indifference standard embodies both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious…." Second, the charged official must act with a sufficiently culpable state of mind…. Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.

*Hathaway*, 37 F.3d at 66 (citations omitted). Taking the evidence before the Court on this motion in the light most favorable to the non-moving party, the injuries suffered by Plaintiff were objectively serious. Thus, the first prong of the test[2] is met. Turning to VanRensselaer's state of mind, the question is whether she had a conscious knowledge of the risk and consciously disregarded that risk. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Deliberate indifference cases do not necessarily need expert medical evidence to establish a plaintiff's case. *See Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994) ("We have never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony."). Here, there is a material factual dispute between VanRensselaer and Plaintiff with regard to whether he refused to allow her to examine him. This is not, as VanRensselaer characterizes it, simply a disagreement as to the

---

[2]The test was discussed in detail by the Supreme Court in *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

proper treatment, which might amount to medical malpractice at worst. On the contrary, if the fact finder determines that Plaintiff's version of the event is credible, then this amounted to a complete lack of care, and the risk that Plaintiff's serious injuries could have resulted in his death. A nurse would most likely have been able to assess the serious nature of Plaintiff's injuries, especially the broken jaw, and could have sent him to the hospital hours earlier than he eventually went. Even if the damages are speculative, Plaintiff would be entitled to ask the jury for nominal damages. *See German v. Broward County Sheriff's Office*, No. , 2011 WL 3847459 (11th Cir. 2011) (the plaintiff argued he was entitled to nominal damages even though the deliberate indifference did not cause injury); *Cummings v. Connell*, 402 F.3d 936, 942 (9th Cir. 2005) ("Nominal damages, however, serve a separate function. As distinguished from punitive and compensatory damages, nominal damages are awarded to vindicate rights, the infringement of which has not caused actual, provable injury."). Consequently, the material issue of fact, that is, whether VanRensselaer refused to examine Plaintiff, or Plaintiff refused to allow VanRensselaer to examine him, precludes summary judgment for VanRensselaer.

## CONCLUSION

Defendants' application, ECF No. 59, is granted in part. As Plaintiff has withdrawn the claims against defendants John Brinthaupt, Christopher Moss and Daniel Mandell, the Court dismisses those parties from this lawsuit with prejudice. The Court grants judgment to Lieutenant John Hamula. The Court does not rule on whether it has personal jurisdiction over defendant Mark Jones. A material issue of fact precludes entry of judgment for Nurse Elnora VanRensselaer. Accordingly, the lawsuit may go forward

with defendants Mark Jones and Elnora VanRensselaer.

It Is So Ordered.

DATED:   December 12, 2011
              Rochester, New York

ENTER.

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Court Judge